Good morning, Your Honor. My name is Peter Sessions. I represent the plaintiff and the appellant in this action, Jacqueline A. I'd like to reserve two minutes for rebuttal, if I may. This case is about a woman who suffers from a host of mental illnesses, including bulimia nervosa, major depressive disorder, post-traumatic stress disorder stemming from childhood sexual abuse, and these collective ailments have essentially destroyed her life. During the time period in question in this case, which is from 2014 through 2015, her disabilities, Center for Hope in Valenta, showed that due to her disorders she was consistently binging or felt a strong need to binge food. She needed supervision at her meals. She had suicidal thoughts. She had obsessive and distorted thoughts about food and her weight, engaged in ritualized food behaviors, and perhaps most alarmingly, she engaged in other disordered behaviors as well. So as I understand this record, and I need your help on it, with respect to all the hospitalizations that are the subject of the dispute in this case, the plan, if you will, to take collectively the defendants, said, we think a different form of treatment than the one you're receiving is equally efficacious and less costly. Is that fair? That's fair. And that was outpatient treatment of some variety of intensity. Right. Well, there's several levels of mental health treatment. And at the top you have hospitalization. And then you go down to residential. And in each case, they thought something less than hospitalization was the most, was as effective and less costly. That was their argument, yes. If we are, I know you argue that we review that de novo, but let's assume for the moment that we're reviewing for abuse of discretion. They had in each case some medical expert opined to why that was appropriate. How could we find that abuse of discretion? Well, the touchstone of the abuse of discretion evaluation is reasonableness. The question is, was this a reasonable decision made by the planned fiduciaries? But does it become reasonable if they have the record analyzed by an expert who says this is the best form of treatment or the most efficacious form of treatment? And it does become unreasonable simply because you have contrary evidence? It becomes unreasonable. You have to look at the rationale for the denial in order to have obtained reports from physicians saying that this treatment wasn't necessary. Just because those reports exist doesn't mean that their decision was reasonable. Add to the fact that the reports exist the fact that your client, the one hospitalization that doesn't seem to be at issue here, the very first one, was recommended outpatient treatment at that point. Does that make their determination reasonable? I'm sorry, I'm not sure I understand the question. As I understand the record, there's a hospitalization in this case that's not at issue. That's right. Right? That's correct. And your client goes to that hospitalization and that facility recommends outpatient treatment? They recommended, I believe they recommended partial hospitalization treatment. Well, she admitted herself, I'm trying to figure out, is this the one where you're not denying coverage? They're not denying coverage. It's the Montenito treatment center. Right. They did deny coverage for that. Right. They denied coverage. You're not fighting about that one. Right. And didn't Montenito suggest, wasn't it suggested at the time by the people when she was discharged that outpatient treatment was the appropriate next course? I don't recall. I'm not sure I can answer that question. I'd have to dig up the record to take a look at that. If that were true, would that be a fact that the administrator might be able to take into account in making its decision? It's something they could take into account, yes, but also the court should also take into account the lapse of time in between her treatment. Was there ever any outpatient treatment that your client had that helped her, improved her condition? She'd received many forms of treatment throughout her life, including outpatient treatment. But I think it's clear from the record, if this court takes a look at it, that she, at this time, she experienced a real exacerbation of her issues. And so it's for that reason that we think... One other record question. There's no circumstance, at least involving the claims here, where Optum slash the plan didn't offer to pay for outpatient treatment? Optum... No, Optum always offered a lower level form of treatment. And that's what makes this case interesting is because in many of these types of cases, there's one level of treatment at issue. But here in this case, she received care across the spectrum. She received residential treatment, partial hospitalization treatment, and intensive outpatient treatment. And at every level of treatment, Optum said, this is the wrong level of treatment. See, and that's what makes this case hard, at least from my perspective in terms of review. We normally see an ERISA plan denying treatment. And we can say that was unreasonable here because somebody obviously had a difficult problem. And the fact that you got an expert to say it's not difficult. But here we have a fight about the level of treatment. So how does that way come into our analysis of abuse of discretion if we have to do that? Right. Well, I think the way to look at it is you have to look at the opinions of her and then compare those with the opinions of the reviewing physicians that are employed by Optum. And so let me just ask you because I think I'd like for you to make your best case on that. I know you've been, you've argued in your briefs that de novo review should apply here to Optum's denial of benefits. But let's assume that the standard view is abuse of discretion in terms of the facts or whatever. Why Optum was still wrong to deny the benefits because it seems to me you have different varying levels of care that they approved. And there are some disputes as to whether or not it should have been this at that time. And it also seems that Optum relied on Jacqueline's, your client's treatment records to explain the details. So to me that makes it seem a little harder to say that there was an abuse of discretion assuming that's the standard we apply. So give us your best case. Just as a broad overview, these various levels of treatment are set up in a way to assist patients to give finally granulated treatment that will help them out. Ironically, this very system of granulated treatment works against them when they try to make benefit claims because then it gives insurance companies and plan administrators the ability to say, oh yes, you did need treatment, but you didn't need quite that treatment. You needed a different level of treatment. And in this particular case, I can tell you why these decisions were wrong because under abuse of discretion standard of review, what you're doing is you're looking at Optum's decisions and were those decisions reasonable based on facts in the record. And if you look at Optum's decisions, you see that they consistently use boilerplate conclusory language. They use standards. They apply standards that either weren't in the plan or in their guidelines. On several occasions, they in fact cite... Well, give us an example. I mean, be helpful. Give us your best examples. I guess that's what I'm looking for. The perfect example... There's a lot of information here and I've reviewed it, but tell me why, what's your best example? Sure. One example is you repeatedly see in Optum's denials the assertion that she's medically stable. But medically stable is not a criterion for denying claims in either the plan or in Optum's guidelines. Well, but certainly if somebody is medically unstable, you would want them in a higher setting of care than if they're medically stable, correct? Well, that's right. And interestingly, if you look at Optum's guidelines, medical stability is in fact a requirement for these levels of care, for all these levels of care, for intensive outpatient and partial hospitalization. Optum's guidelines say you must be medically stable. So it's your argument that relying on medical stability was irrational under these circumstances because you had to find medical instability to approve any level of care? Right. They're using a criterion that is required for a level of care to say you shouldn't get this care. Let's go back to Judge McGee's question. I've got the same one and I'm still not sure. I've That's correct. Tell me which decision that they made is, in your view, the worst in terms of the abuse of discretion standard and tell me why it was. I would say that the denial for her partial hospitalization treatment at Valenta is the most egregious one because it's during this period that she is engaging in behavior that she's dissociating from reality and she's having trouble maintaining hygiene. She's taking her clothes off in the middle of the day and it's during this period that Optum addresses and says in its denial letter that your thinking was clear and you were not depressed. That's what their denial letter, their final appeal denial letter says. And they say this during a time period when she's dissociating and is clearly depressed because the treatment records say repeatedly that she's suffering from depression. And so, and this is a problem that we see. Can you just cite to the record on that where that is? Yes, give me a moment. Optum's, are you asking for Optum's denial letter or are you asking for the? I just want an ER site to see where it's going. We know what they said. Where's the evidence that's contrary? We know what their denial letter said. Where's the evidence that's contrary to their denial letter? Right now you said she was a, she was a. Oh, I see what you're saying. She was dissociative state, she was dysrhobine. I would have to go into the brief to do that. I don't know if the court wants me to. But in the record, where in the record is that? Right, but I, what I'm saying is I'd have to look into the brief to. See, because what I have here is SER 172. We're in on admission to Valenta. She said that she didn't, hadn't harmed herself and didn't have suicidal intentions. And she doesn't seem to have a dangerous body weight. She has an eating disorder and they, they conclude on, they conclude by looking at the time when she was admitted that her body weight wasn't dangerous. Is there, is there evidence that those, that those conclusions that they made were, are not supported by the record anywhere? With regard to the body weight, that's another, in fact, a good example of why the decision was wrong. Because she didn't suffer from anorexia, which is characterized by low body weight. She suffered from bulimia. Right. So bulimia, many bulimics have normal body weights. See, and one of my difficulties here is if we're arguing about the relative weight to be given facts, abusive discretion standard tilts the other way. If we're arguing that they, that they based it on facts that were not accurate or not supported by the record, then we have a much stronger argument for abusive discretion. So what you're really arguing is that the facts that they were relying on shouldn't have been facts that they were relying on, even if they were accurate. No, I, I, I, I very often, as I just said, they relied on facts that simply were not in the record. Okay. And that's, that's where we're asking. I, I try to point to the record there and ask you if those facts were in the record or not. Did, doesn't the record indicate that in La Volenta she denied that she'd harmed herself or had suicidal intentions? She said that on admission. But if you look throughout the record, there are many occasions where the, her treatment records show that she had passive suicidal ideation, which is a desire to be dead, but without any concrete plan. And at that time when they made that decision that you're saying is probably the best example of abusive discretion, is that what the record indicated, the medical record indicated? The medical record indicated during her treatment period at Valenta that she was engaged in a numerous disordered behavior of the kind that I've just mentioned. And none of that behavior is ever addressed by Optum in any of the denial letters. In fact, if you look at what Optum did in its denial letters, it narrowly focused on what plaintiff was not experiencing, instead of focusing on what she was experiencing and explaining why those experiences didn't support the payment of her claims. Would you agree that sometimes the record is conflicting? In other words, she was reporting one thing, then another, or a doctor was finding. Oh, absolutely. And that's consistent with mental illness patients. That's what happens. And so under an abusive discretion standard, it makes it tougher when there are conflicts in the record. For you. In a perfect world, yes. There would not be those conflicts. But I think under abusive discretion standard review, the important thing to do is to look at the denials and see whether they're supported by facts in the record. And these denials either aren't supported by facts in the record or cite the facts that are irrelevant, such as her weight and the fact that she wasn't purging. What's your best case? Because, I mean, that's certainly a fair point. If the medical folks here were focusing on facts that she was not exhibiting, what's your best case that says, hey, when they do that, we need to save abusive discretion? The Lucas case, which we cited in our brief, is probably the best one for that. I see I'm short on time and we haven't touched on the standard review issues at all. So I would like to briefly address those. Maybe on your rebuttal, if I give you some time. I can do that. Thank you. Thank you. Good morning, Your Honors. I'm Gene Nogas and I represent the motion picture industry health plan. I would be taking 10 minutes for argument today and my colleague, Ms. Klein, representing Optum Health, would like to take five minutes of our total time. I think that the court hit the nail on the head when it noted that this is not a case where there's an outright denial of any treatment. Clearly, Jacqueline A suffered from eating disorders. The question is, what level of treatment was appropriate? If I can pick up on the question in your opposing counsel, let me focus for a moment on Valenta, which he highlighted for us today. According to his opening brief, many of Optum's findings contradict the evidence, not necessarily that they were supported, but contradict. Example, in denying coverage at Valenta, Optum wrote that Jacqueline did not have depression, but the record indicates she was diagnosed with a major depressive disorder, both recurrent and severe. That's at ER 84, also at ER 170. Optum also concluded that she did not have urges to binge. ER 245, although the record says the opposite, at ER 185-87 and 192. So, will you concede that at least some of Optum's findings seem to lack evidentiary support? And if they do, then wasn't denial of coverage inappropriate? No, Your Honor, I would not concede that. Because I think what they're referring to is an April 13, 2018 letter, the final letter that was after the district court remanded the question back to Optum. And as the district court recognized in its opinion, there's an obvious typo in that letter. And if you look carefully at SER 0193, what you'll see is that there is a statement that reads, while you continued to face challenges as you worked on recovery, especially with, and then this is where the typo exists, it goes to a different sentence, your thinking was clear, what happened was somebody inserted some language in there, and actually the end of that sentence is three lines later. The way it should read is, while you continued to face challenges as you worked on recovery, especially with depression, urges to binge, and dealing with past trauma, you did not require the kind of clinical help provided in this setting. And the reason we know that's a typo is because on the same day, that's the PHP denial letter, on the same day the remand was decided for the intensive outpatient care. For the two claims? Yes, they were decided the same day. And in that second letter that same day, which appears at SER 0204, the letter recognizes that she still had depression. Did the district court treat that apparent, your claim of typographical error? Did the court find that it was a typographical error? Yes, there is a specific statement in the opinion about that. I have a factual question about the remand. Yes, Your Honor. Obviously, the claims hadn't been, these two claims hadn't been decided. It's true, Your Honor. And they came up, and if the court had had to address them at that point, it would have had to, I think, used it over a review. But instead, it decides to remand, and it says, I did this after discussing it with the parties. Did the parties agree that a remand was appropriate, or did the court just say, this is what I think I want to do, tell me whether you think I should? No, Your Honor. We argued that if the court felt that the decision ought to be made, that it ought to go to remand, and the court accepted that. But the record doesn't seem to indicate whether the plaintiff agreed to that or didn't agree to that. No, the plaintiff did not agree to that. Okay. So tell me what authority the court has to remand to the ERISA plan. The authority exists in several places, and in particular, if I can find my notes here. I mean, it makes a lot of sense, because the court's saying, I don't want to decide this issue. Why don't you decide it in the first place? And I know we cited the cases in the brief, and I'm just trying to find the real picture. They're not, I'm not, you don't have to spend a lot of time. They're not attacking the authority for the remand. No, they're not. They're not really, they're not contesting the remand. They're just saying that nonetheless, there should be de novo review. Right. But I've never seen a remand to an ERISA plan. There were three cases that we cited in specific. SAFL, Roberts v. Anthem Life, and Mongaluzzo. All of those cases are cited in the brief, and they all involve remands, and each of them holds that the court's authority to remand is discretionary. And as you pointed out, the plaintiff does not contest the validity of the remand here. On this record, the other de novo, I want to try to make your friend's arguments for him because we cut him off, or had him, had him, asked him to assume abuse of discretion review, he says, while the plan may have had discretion, Optum did not. Optum, it did not delegate that discretion to Optum. It merely delegated claims administration responsibility to Optum. I hope I've made his argument the way he would have made it, but he'll tell me if I didn't, respond to that for me. I think his argument may be a little more nuanced than that, but I'll respond to your question first, and then to what I believe his argument to be his more nuanced argument. The plan clearly does provide that the directors have the authority to delegate claims handling and their discretion to. Where does it say, and their discretion? Because that's the language. If we go back to the cases like Kearney and other cases that talk about whether there's discretion in, given to directors to begin with, the language. Here's the provision I think that's in, the administration committee may delegate its authority with respect to the denial, et cetera, et cetera, to, to other folks. Correct. So when you say it's authority, that, in your view, that encompasses discretion. Right. Because it, it, it, your, your honor may recall that the, the, the case law says that you don't have to, when you reserve discretion, you don't have to use the word discretion, it simply has to be clear that you reserve discretion. There's no doubt in this case, the plan reserved discretion. So his, their argument is the plan may have reserved discretion, but the plan didn't delegate discretion. If we look at the administrative services agreement, it specifically delegates discretion by name. It says the discretion is delegated. And the language appears on SCR 0191 and it's, Optum is delegated. I'm quoting now, the discretionary authority to construe and interpret the terms of the plan and determine the validity of charges submitted to Optum. That language is in ESF. So the discretion, it was expressly delegated. Yes, sir. Is there a procedure in this case for appeal from the Optum's decision to the plan or is it the appeal internal at Optum? The, there is actually a provision that would allow a second level appeal if plaintiff requested it. And that, that appeal. And that would be to the plan itself? Under, under the ASA, Optum is required to then transmit that appeal to the plan to decide. Was that, was that appeal in these cases? It was not done here. I'm sorry, I took you astray. I'm not sure where I was. So if we are, let's assume we're looking at under abusive discretion standard then, can you address the Lucas case that your friend across the aisle? I have to look real quickly at my notes about it. And that was, because it seems like the, one of the points that, that he's making is that the plan here was focusing on, on behavior, things that she was not exhibiting instead of things that she was exhibiting, that they did that throughout, and that that should form the basis of why they abused their discretion. I did bring Lucas with me, Your Honor. So I'm afraid I can't address it directly, but my response to that is that, that the plan, or Optum in this case, who was the administrator for the plan, looked at all the facts and circumstances, discussed them all, and concluded that given things like her medical stability, the fact that she wasn't actively suicidal, the fact that she didn't have any homicidal intent, the fact that she had in the past been successfully treated at an outpatient level, and importantly, the fact that there was nothing to indicate that she couldn't be successfully and safely treated at a slightly lower level of care, in the instance of partial hospitalization, they suggested intensive outpatient, and then approved intensive outpatient for a period of about 10 days when she transitioned out of the unauthorized PHP, and then said, after that, we need to move to outpatient, so each time, there was a slight step down, but under the terms of the plan, as applied by Optum, the fact that there was an efficacious and safe treatment at a lower cost is a condition to coverage, and that's what happened here. That's the bottom line. So when I looked at the denial letters, I thought that they perhaps lacked some detail that I was expecting, but then as I reflected, I thought, well, you're not denying coverage, you're merely distinguishing what level of coverage is appropriate, and that led me to conclude that by identifying the things that were positive in her records would support the decision that she needed a lower level of treatment rather than a higher level. I think that's right, Your Honor. I think they were looking at her overall medical condition to determine if she needed this kind of intensive, I mean, in terms of the residential care, it's 24-7, in terms of the partial hospitalization, it's five days a week, all day. Intensive outpatient is, depending on who you look at for that, is four or five hours a week of treatment. Looking at her overall medical condition, looking at the symptoms she's complaining about, looking at her, it just seemed appropriate to them and in their discretion, in a professional judgment, that she'd be treated at a slightly lower level. So what's one of the problems I'm having in analyzing the letters in this case, because I don't know anything, is what's the difference between what would justify residential treatment and some lower level of care? In other words, I'm not sure I can tell by looking at the policy or guidelines, so what's the, how do I know, when your folks sit down and say, we have an application here, we need to decide the level of care, what are the criteria and where can I find them? Well, the criteria, I think, are articulated in the various letters that were issued by Optum. They stepped them out. Those are post hoc criteria, if you will. I'm trying to figure out whether or not. And the earlier ones too, because in connection with each of these denials, there's actually a letter that went out at the time of the original denial as well, that identified various standards. I remember in one case, APA standards, several Optum's internal guidelines, all of those are cited. I'm not a physician either. I'm just trying to figure out how we measure a decision based on facts against an arbitrary and capricious standard, unless we know what the standard is for hospitalization treatment. I think it comes down to the fact that you had four or five psychiatrists, either employed by Optum or by a peer review company, look at these, apply their professional judgment and conclude that a lower level of care was appropriate. In an abuse of discretion standard, that seems to me to be enough, when there's nothing inconsistent with what they're saying in the record. Sometimes when full hospitalization was requested, she got partial hospitalization. When she requested residential treatment, which is the 24-7 treatment, at different times, Optum suggested different levels of care. I think in one instance, they suggested intensive outpatient. I don't recall that they actually suggested partial hospitalization. There was a term there that I wanted to see. Right, right. Without going back and looking at the record again, because it is a long and confusing record, I can't answer that directly. Okay, so did you want to at least give one minute? Yes, I'm sorry. You're on here. Thank you, Your Honor. I'll be brief. First of all, I'm Elise Kleiner, I represent Optum. I wanted to, first of all, address Judge Hurwitz's question about the trial court addressing the typographical error. It's at ER 24. So Judge Cronstadt did address that. Second of all, I wanted just to point out briefly that as Mr. The plan did pay for weeks of treatment, so it's not as if all treatment was denied, weeks of treatment were paid for. And just very briefly, Your Honors, the difference between residential is that's 24-7 care, the person lives in the facility and gets treatment as needed. Partial hospitalization is the person comes to the program and spends hours in treatment every day. Intensive outpatient is the person comes to the program on a daily basis for fewer hours of treatment. And then there's standard outpatient where the person's in standard treatment with the therapist. But the points that I wanted to make on behalf of Optum, obviously we join in the plan's arguments, and I'm not going to repeat any of those here, but I do want to make a couple of quick points just on behalf of Optum. First of all, appellant argues that Optum did not cross appeal, so it should not be permitted to raise any separate... You're seeking to support the judgment below, so you don't need to cross appeal. Exactly. So tell me why you're not the proper defendant in this case. You're exercising control over benefits claim processing, aren't you? Well, we are conducting the initial benefit review, yes. You're doing the entire benefit review. Well, no, because there is an option for the affected patient to appeal to the plan itself. But in reality, you do the benefit review and you do the initial appeal, correct? Sure. Doesn't that give you control over benefits claim processing? No, it does not, Your Honors, but especially since we're not paying the benefit, and that's the key distinguisher here. We are post-judgment and the only relief that... So what case do you have that says, I know you argue from general principles, Spindex, in our court, seems to hurt you. Tell me what your best case is that somebody who processes the claims makes decisions about denial, because they're not complaining about how much your payment, they're complaining about the denial, makes decisions about denial as not an appropriate defendant under the statute. What's your best case? It's not the case, Your Honor. It's the statute, and I want to address that. You think the statute says? Yes, Your Honor, and I would like to address that very specifically. We are post-judgment. That's up to Judge McGee whether you get to do more. I was just asking what your best case was. Well, let me just answer the question. Go ahead. Okay. Thank you, Your Honor. Plaintiff is asking, and this is... I'm reading from the last lines of plaintiff's or appellant's reply brief. Plaintiff wants judgment entered in her favor with regard to her treatment and remand to allow plaintiff to file a motion for costs. So all that plaintiff is asking for is a money judgment. ERISA section 502A1B permits a participant or beneficiary to seek three things. One is a money judgment, which would not be appropriate against Optum because we don't pay the benefits. A second would be to clarify rights to future benefits, which is not being requested, and a third would be to enforce rights under the terms of the plan. Didn't you skip the second one to enforce his rights under the terms of the plan? No, I just said that. I just said it out of order. My apologies. Why isn't she seeking to enforce her rights under terms of the plan? Because she wants payment. There's no indication that she's ever going to seek treatment again. There's no indication that she's a member of the plan. If she was seeking to get coverage for future treatment, would you be an appropriate defendant? As long as I couldn't convince the court otherwise, yes. But I would argue... Right, exactly. But I would argue, Your Honor, that unless it's seeking a declaration about future benefits, and there's an ongoing relationship, an ongoing right, and an ongoing argument that this may come up again, that we should not be independent because, plain and simply, we cannot pay the benefit. And very clearly... Now, let's go back to my question I asked you before. That's your reading of the statute. Do you have a case that says... There are no cases on this, either way. Okay. I thank you very much. But I would just respectfully point out, and then I will sit down, I promise, that this is the requesting judgment in her favor with regard to payment for treatment four years ago. So there's no allegation of ongoing treatment. There's no allegation that Optum could or could not do anything in the future. This is all payment, which is not Optum's responsibility here. Thank you, Your Honors. Thank you. I'd like to return briefly... I'll give you one minute. I'd like to return briefly to two issues that we discussed that I perhaps did not have the best answers for when I was speaking earlier. The court asked for the best evidence regarding the plaintiff's treatment at Valenta. I would direct the court to page 12 of our opening brief. There are too many citations to the record for me to list them all right now. But if the court looks at page 12 of our opening brief, that will list all the treatment records and the citations there. Also, we talked briefly about what our best case was. I mentioned the Lucas case. I'd also like to direct the court to the Pacific Shores case. In many ways, that case is actually better than Lucas because that case also involved Optum, and the court found in that case that the medical reviewers had made critical factual errors, and we believe the same thing happened here. And finally, I just want to discuss the standard review because I didn't get a chance to do that in my original presentation. To the extent the court has any concerns about whether the facts in this case supported a finding for plaintiff under the abuse of discretion standard review, I think the court, at a minimum, has to remand this case back to the district court because of Optum's failures to review the Valenta appeals. The RISA regulations are very clear that you have 60 days to decide an appeal, and it's clear in this case that Optum did not do that, and they only did it when the district court ordered them to do it. So it's very clear under the regulation and under this court's decision in what Jebbien says is that we're not going to defer to an administrator that doesn't exercise its discretionary authority, and here it's clear that they did not exercise their discretionary authority because they failed to respond to the appeal, and the fact that they did so after the court remanded it to them doesn't give them a new entitlement to that deferential review for the reasons that are set forth in the Trevette case, which we cited in our brief. So is it your position the district court didn't have the authority to remand? And if they do have the authority to remand, how do we treat the information that comes in at the later date? No, the district court had the power and the authority to remand it. It had the effect of saying, well, I'm going to give you an extension of time. Yes. And then we would nonetheless review de novo after that? Yes. Why remand in the first place then? In other words, isn't the remand then completely irrelevant because the district court has exactly the determination on exactly the same evidence that the plan makes after remand? Well, it's not irrelevant because it gives the administrator a new chance to evaluate the evidence. The administrator might change its mind. But we don't care how he does it because we get to review it de novo. No, but it matters because you also get a thorough record at that point. You get a full consideration by the administrator of all of the appeals. The question is, well, do you defer to those determinations or not? And Jebbian very clearly says that if you don't comply with the deadlines, then you don't get that deference. And here it's very clear that Optin did not comply with the deadlines. From our perspective, it's a very cut and dried issue. Thank you. Thank you all for your presentations here today. Mr. Sessions, Mr. Nogas and Ms. Klein, appreciate it. That concludes the case of Jacqueline A. versus Motion Picture Industry Health Plan. It's now submitted and that concludes our docket of cases here this morning. So we'll be in recess. Thank you. This court for this session stands adjourned.
judges: Murguia, Hurwitz, Zouhary